UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

                Plaintiff,

       v.

ALL FUNDS, UP TO $337,500.00 IN
CITIBANK ACCOUNT NO. 36142246
MAINTAINED BY BANQUE
INTERNATIONALE DU CAMEROUN
POUR L'EPARGNE ET LE CREDIT,
WHICH IS A PORTION OF THE
$450,000.00 SUBJECT TO FORFEITURE
DEPOSITED INTO BANQUE
INTERNATIONALE DU CAMEROUN
POUR L'EPARGNE ET LE CREDIT
ACCOUNT NO. 4725116400116 AND THE
$87,500.00 SUBJECT TO FORFEITURE
DEPOSITED INTO BANQUE
INTERNATIONALE DU CAMEROUN
ACCOUNT NO. 3527750000121,

ALL FUNDS, UP TO $200,000.00 IN
STANDARD CHARTERED BANK
ACCOUNT NO. 3582-025967-001
MAINTAINED BY BANQUE
INTERNATIONALE DU CAMEROUN
POUR L'EPARGNE ET LE CREDIT,
WHICH IS THE REMAINING PORTION
OF THE $450,000.00 SUBJECT TO
FORFEITURE DEPOSITED INTO
BANQUE INTERNATIONALE DU
CAMEROUN POUR L'EPARGNE ET LE
CREDIT ACCOUNT NO. 4725116400116
AND THE $87,500.00 SUBJECT TO
FORFEITURE DEPOSITED INTO
BANQUE INTERNATIONALE DU
CAMEROUN ACCOUNT NO.
3527750000121,

                Defendants.

Civil Action No.

<u>Under Seal</u>

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Plaintiff United States of America, by and through its attorney, the United States

Attorney for the District of Columbia, brings this Verified Complaint for Forfeiture in Rem

("Complaint") against All Funds, up to $337,500.00 in Citibank account no. 36142246

maintained by Banque Internationale du Cameroun Pour L'Epargne et Le Credit ("BICEC") and

All Funds, up to $200,000.00 in Standard Chartered Bank account no. 3582-025967-001

maintained by BICEC ("the defendant property"), and alleges as follows in accordance with

Supplemental Rule for Admiralty or Maritime Claims and Asset Forfeiture Actions

("Supplemental Rule") G(2).

## I. NATURE OF THE ACTION

1.      This is a civil forfeiture action *in rem* to forfeit all right, title, and interest in the

defendant property to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A), (C) &

981(k)(1)(A).

2.      The United States Attorney's Office for the District of Columbia, in conjunction

with the Federal Bureau of Investigation ("FBI"), the U.S. Department of Health and Human

Services Office of Inspector General ("HHS-OIG"), the District of Columbia Medicaid Fraud

Control Unit ("MFCU"), the U.S. Secret Service ("USSS"), the Internal Revenue Service

("IRS"), the Department of Labor Office of Inspector General ("DOL-OIG"), the Social Security

Administration Office of Inspector General ("SSA-OIG"), the Department of Homeland Security

Immigration and Customs Enforcement ("ICE"), the Maryland MFCU, and others, have been

conducting a multi-year investigation into the Medicaid fraud, kickbacks, and false billing

relating to home care services and home care agencies ("HCAs") in the District of Columbia

Medicaid program.  Subjects of the investigation include principals and employees of home

2

health agencies and staffing agencies, recruiters for home health agencies, and doctors prescribing plans of care for home health services. The investigation is on-going.

3.      Florence Bikundi, also known as Florence Igwacho and Florence Ngwe, has been excluded from participation in all Federal health care programs, including Medicaid, since April 2000. From July 2007 to the present, Florence Bikundi, in violation of her exclusion, has caused two home care agencies that she controls, Global Healthcare, Inc., located in the District of Columbia and Maryland,[1] and Flo-Diamond, Inc., located in Maryland, to submit Medicaid claims to the District of Columbia and Maryland in violation of her exclusion. During this time period, the companies have received over $75 million in Medicaid payments.

4.      On February 19, 2014, a grand jury in the United States District Court for the District of Columbia returned an indictment (the "Indictment") charging Florence Bikundi with one count of Health Care Fraud, in violation of 18 U.S.C. §1347; one count of Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of 42 U.S.C. § 1320a-7b(a)(3); four counts of Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and three counts of Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957. The Indictment also includes a Forfeiture Allegation for each count and seeks the forfeiture of the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland ("the Jennings Mill Drive property"). The case number is 14-cr-00030-BAH.

5.      Based on the facts set forth in this Complaint, there is a reasonable belief that the defendant property is subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), (k)(1)(A), as any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a specified unlawful activity.

---

[1] References to Global Healthcare in this Complaint encompass both locations.

3

6.   Based on the facts set forth in this Complaint, there is also a reasonable belief that the defendant property is subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(A), (k)(1)(A), as any property, real or personal, involved in a transaction in violation of 18 U.S.C. §§ 1956 & 1957, or any property traceable to such property.

## II. THE DEFENDANT PROPERTY

7.   The Defendant property is:

a. All funds, up to $337,500.00, in Citibank account no. 36142246 maintained by BICEC, which is a portion of the $450,000.00 subject to forfeiture deposited into BICEC account no. 4725116400116 and the $87,500.00 subject to forfeiture deposited into BICEC account no. 3527750000121; and

b. All funds, up to $200,000.00, in Standard Chartered Bank account no. 3582-025967-001 maintained by BICEC, which is the remaining portion of the $450,000.00 subject to forfeiture deposited into BICEC account no. 4725116400116 and the $87,500.00 subject to forfeiture deposited into BICEC account no. 3527750000121.

8.   BICEC is a foreign financial institution as defined in 18 U.S.C. § 984(c)(2)(A). Citibank and Standard Chartered Bank are financial institutions as defined in 31 U.S.C. § 5318(j)(1). BICEC has interbank accounts at Citibank and Standard Charter Bank. As discussed in further detail below, a total of $537,500.00 in funds subject to forfeiture was wired to two BICEC accounts located in Cameroon.

## III. JURISDICTION AND VENUE

9.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1345, as this is a civil action commenced by the United States; and pursuant to 28 U.S.C. § 1355(a), as this is an action or proceeding for the recovery or enforcement of a forfeiture.

10.     This Court has *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred within the District of Columbia; and pursuant to 28 U.S.C. § 1355(b)(1)(B), which provides for *in rem* jurisdiction in any district where venue is proper under 28 U.S.C. § 1395.

11.     Venue in the District of Columbia is proper pursuant to 28 U.S.C. §1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred within the District of Columbia.

## IV. JUDICIAL AUTHORIZATION AND PROCESS

12.     The defendant property is not in the government's possession, custody, or control; nor is it subject to a judicial restraining order.  As set forth in Supplemental Rule G(3)(b)(ii), the Court, upon a finding of probable cause, must issue a warrant to arrest the property.

## V. NOTICE

13.     The United States will publish notice of this action according to the procedures in Supplemental Rule G(4)(a).

14.     The United States will send direct notice of this action and a copy of this Complaint to any person who reasonably appears to be a potential claimant, pursuant to Supplemental Rule G(4)(b).

## VI. FACTUAL BASIS FOR FORFEITURE

### A. BACKGROUND OF FLORENCE BIKUNDI

15.     Florence Bikundi is a native of Cameroon.  Following her 2003 criminal convictions, discussed below, an Immigration Judge ordered her to be removed from the United States.  However, the judge withheld her removal.  For the purposes of this Complaint, Florence Bikundi is referred to as Florence Bikundi except in circumstances in which she used the name

Florence Igwacho or Florence Ngwe, or in circumstances in which she is referred to as Florence

Igwacho or Florence Ngwe in any document or record.

16.     The Marriage Register for the Circuit Court of Fairfax County, Virginia, indicates

that on September 5, 2009, Florence Igwacho married Michael Davis Bikundi in Fairfax County,

Virginia. Florence Igwacho and Michael Bikundi indicated on the marriage register that it was

the first marriage for both of them. Florence Igwacho and Michael Bikundi filed U.S. income

tax returns for the years 2007 and 2008 with the status of "married filing jointly."

17.     On her INS Form G-325A, "Biographic Information," dated February 29, 2008,

Florence Bikundi wrote that in 1997, she married Michael Bikundi in Douala, Cameroon. On

her INS Form N-400, "Application for Naturalization," dated August 23, 2000, she indicated that

she was single.

18.     As discussed in more detail below, Florence Bikundi has often used the name

Florence Igwacho since her September 5, 2009, marriage to Michael Bikundi in Fairfax County,

Virginia.

19.     The following relatives of Florence Bikundi and Michael Bikundi are referenced

in this Complaint:

         a.  Carlson Igwacho – son of Florence Bikundi;

         b.  Michael Bikundi, Jr. – son of Michael Bikundi;

         c.  McRoy Bikundi – son of Michael Bikundi;

         d.  Ernest Igwacho – brother of Florence Bikundi.

20.     On October 18, 2004, Florence Igwacho filed a Voluntary Petition for

Bankruptcy, pursuant to Chapter 7 of the Bankruptcy Code, in the United States Bankruptcy

Court for the District of Maryland. On January 10, 2005, the Bankruptcy Court issued an Order discharging her debts and a Final Decree that her estate has been fully administered.

21.     On September 8, 2005, Florence Igwacho and Carlson Igwacho purchased the real property located at 15703 Appleton Court, Bowie, Maryland ("the Appleton Court property").

22.     On October 17, 2008, a notice of default on the mortgage for the Appleton Court property was recorded in Prince George's County, Maryland. On March 18, 2009, an Order to Docket Foreclosure for the Appleton Court property was filed in Prince George's County Circuit Court. The Appleton Court property was sold at public auction on December 3, 2010.

23.     On September 23, 2009, Florence Igwacho purchased the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland ("the Jennings Mill property") for $880,000. On August 11, 2009, Florence Igwacho submitted a Uniform Residential Loan Application for a mortgage on the Jennings Mill property. The application is signed in the name of Florence Igwacho and contains numerous false statements.

24.     In section III of the application, Florence Igwacho lists her present address as 15703 Appleton Court, Bowie, Maryland. She indicates that she rents the property and has lived there for over five years. In Section VIII of the application, the "No" box is checked in response to question "m,": "Have you had an ownership interest in a property in the last three years?" On a "First-Time Maryland Home Buyer Affidavit," dated August 28, 2009, Florence Igwacho affirms that she "has never owned, in the State of Maryland, residential real property which has been [her] principal residence and that property herein conveyed will be occupied by the grantee[] as [her] principal residence." In Section VIII, question "f" of the application, the "No" box is checked in response to the question: "Are you presently delinquent or in default of any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee?" As

previously discussed in paragraphs 21 and 22, Florence Igwacho and Carlson Igwacho owned the

Appleton Court property until they defaulted on the mortgage in 2008, and the lender initiated

foreclosure proceedings in 2009.

25.     In Section VIII of the application, the "No" box is checked in response to

question "b": "Have you been declared bankrupt within the past 7 years?"  As previously

discussed in paragraph 20, on October 18, 2004, Florence Igwacho filed a Voluntary Petition for

Bankruptcy, pursuant to Chapter 7 of the Bankruptcy Code, and on January 10, 2005, the United

States Bankruptcy Court for the District of Maryland the Bankruptcy Court issued an Order

discharging her debts.  On the application, the "Yes" box is checked in response to question "j"

in Section VIII, "Are you a U.S. citizen?"  Florence Bikundi has never been a United States

citizen.

26.     On October 9, 1998, Florence Igwacho was convicted of Theft of Property with

less than $300.00 Value in District Court for Montgomery County.  On May 23, 2002, Florence

Igwacho pleaded guilty in Prince George's County Circuit Court to Practicing Nursing without a

License. The court stayed the entry of judgment and placed the defendant on probation.  This

type of disposition is commonly known as probation before judgment.

27.     On July 8, 2003, Florence Igwacho was convicted of two counts of Practicing

Nursing without a License and one count of Identity Fraud in Baltimore City Circuit Court.  The

factual basis for the conviction was that Florence Igwacho assumed the identity of an actual

registered nurse who practiced in the District of Columbia and was licensed in Maryland.

Florence Igwacho presented the registered nurse's Social Security number, resident alien card,

and Maryland nursing license to nurse staffing agencies.  The staffing agencies then obtained

nursing positions for Florence Igwacho at Baltimore area hospitals.

8

28.     On August 4, 1999, the Virginia Board of Nursing ("the Board") issued an Order

revoking Florence Igwacho's license to practice practical nursing.  The Findings of Fact state

that "[on] or about October 15, 1998, by her own admission, Ms. Igwacho abandoned Patient A,

a four (4) year old child, who is comatose ventilator dependent, with no cough reflex, and

requires twenty-four (24) hour care, seven (7) days a week, in that she left the home to obtain a

non-prescription medication for herself and failed to advise anyone that she was leaving the

patient unattended."  The Findings of Fact also note that on or about October 8, 1998, Florence

Igwacho administered medications to Patient A at approximately 8:00 p.m., when the

medications were ordered for administration at 6:00 p.m.

29.     Florence Igwacho submitted a Virginia Application for Reinstatement of License

as a Licensed Practical Nurse, dated April 13, 2004.  In a letter to Igwacho, dated November 24,

2004, the Board advised her that she may have violated Title 54.1 of the Virginia Code and

Board Regulations.  One potential violation referenced in the letter is that Igwacho answered

"No" to the question "Have you ever been convicted, pled guilty to or pled Nolo Contendere to

the violation of any federal, state or other statute or ordinance constituting a felony or

misdemeanor?"  Another potential violation noted in the letter is that on an employment

application, Florence Igwacho stated that she graduated from Bowie State with an RN, BSN, and

graduated from Howard Community College and Anne Arundel Community College with an

LPN.  Florence Igwacho only took courses at these institutions, and she never graduated from

any of them.

30.     On December 29, 2004, the Board issued an Order denying Florence Igwacho's

petition for reinstatement.  The Board found that Igwacho had in fact committed the violations

discussed in the previous paragraph.

31.     Florence Igwacho was licensed to practice nursing in South Carolina until January 31, 2004, when her license lapsed.  Florence Igwacho filed an Application for Reinstatement, dated March 20, 2004.  The application is marked "No" in response to the question "Since you obtained (new licensees), or last renewed your license, have you: Been convicted, pled guilty, or pled nolo contendere for violating any federal, state, or local law, or do you have charges pending...?"

32.     On November 21, 2007, the South Carolina Board of Nursing permanently revoked Florence Igwacho's nursing license.  As the basis for its decision, the Board of Nursing cited: (1) Florence Igwacho's conviction for identity fraud; (2) her "willfully and repeatedly following a course of conduct that, by reasonable professional or ethical standards, renders [her] incompetent to assume, perform, or be entrusted with the duties, responsibilities, or trusts which normally devolve upon a licensed nurse;" and her attempt to obtain a nursing license "through fraud, deceit, and misrepresentation."

33.     On October 21, 2002, Florence Igwacho submitted a New License Application to the District of Columbia Department of Health seeking to be licensed as an L.P.N (Licensed Practical Nurse).  On June 20, 2003, Florence Ngwe submitted an application to be licensed as an R.N. (Registered Nurse).  Both applications required the applicant to "List all states and jurisdictions in which you have ever held a license."  In both responses, New York and South Carolina were listed, but Virginia was not.  Both applications asked "Has any authority taken adverse action against your license or privileges or informed you of any pending charges not previously reported to this board?"  The "No" box was checked on both applications.

34.     On November 15, 2002, the District of Columbia Department of Health issued a license to Florence Igwacho as an L.P.N., and on September 4, 2003, it issued a license to Florence Ngwe as an R.N.

35.     On May 18, 2005, the District of Columbia Board of Nursing revoked both of her nursing licenses. It cited her Baltimore City Circuit Court convictions, the revocation of her Virginia nursing license for abandoning a patient and failing to administer medications on schedule, and the false responses on her L.P.N. and R.N. applications.

## B. EXCLUSION FROM FEDERAL HEALTH PROGRAMS

36.     On September 7, 1999, HHS-OIG sent a letter[2] to Florence Igwacho informing her that it was "considering excluding [her] from participation in the Medicare, Medicaid, and **all** Federal health care programs as defined in section 1128B(f) of the Social Security Act (Act). This action is predicated on the fact that your license was revoked, suspended or otherwise lost, or because your license was surrendered while a formal disciplinary proceeding was pending for reasons bearing on your professional competence, professional performance, or financial integrity." The letter provided Florence Igwacho with the opportunity to provide any information for HHS-OIG to consider prior to making an exclusion determination.

37.     Florence Igwacho sent a handwritten letter to HHS-OIG responding to her possible exclusion. She acknowledged that her nursing license had been revoked. In the letter, she wrote:

> Sir, I regret that I didn't respond in a timely manner because my son died back in Africa back in June and I had to travel back home. I only returned yesterday 10/5/99 where I received both your letter and the one from Virginia Board of Nursing. I was subpoenaed to appear for a hearing July 19th but it is most unfortunate that I couldn't make it not because I didn't want to but because I was out of the country and at the time I didn't have a lawyer to defend me.

---

[2] Unless otherwise indicated, all quotations from letters or documents are written as they appear in the letter or document.

38.     In her "Application for Naturalization" (Form N-400), dated August 23, 2000,

Florence Igwacho did not indicate that she had traveled to Africa at any time from June through

October 1999. The only travel outside of the United States listed on the application is a trip to

Italy from December 5 to December 19, 1997, and another trip to Italy from December 16 to

December 30, 1999. The travel section of the application contains multiple markings in red pen,

such as circles, underlines, and cross outs through lines that have no responses. Immigration

authorities have advised me that an examiner made the red markings while reviewing the

questions with Florence Igwacho and discussing her responses. Border crossing records from

Customs and Border Protection do not reflect any border crossings, either outbound or inbound,

in June 1999 and October 1999.

39.     On March 31, 2000, HHS-OIG sent a letter to Florence Igwacho notifying her that

she is "being excluded from participation in the Medicare, Medicaid, and **all** Federal health care

programs" because of the revocation of her Virginia nursing license. The letter, which was sent

to the same address to which the September 7, 1999, HHS-OIG letter was sent, which was also

the same address from which Igwacho sent her October 6, 1999, response to the September 7,

1999, letter, explained that "[t]his program exclusion is effective 20 days from the date of this

letter and will remain in effect as long as your license is revoked, suspended, or otherwise lost.

Once your license has been returned to active status by the licensing board or agency taking the

disciplinary in the State of Virginia, you will be eligible to apply to the Office of Inspector

General for reinstatement to the Federal health care programs. We have considered the

information you furnished to our field office in response to its letter to you." The letter informed

Florence Igwacho that "**[o]btaining a license or obtaining a provider number from a**

**Medicare contractor, a State agency, or a Federal health care program does not reinstate**

**your eligibility to participate in those programs."**

40.     The exclusion notice sent to Florence Igwacho included a document explaining

the authority for the exclusion and its effect.  The top of the document instructed Igwacho to

**"Please read carefully and retain."**  It informed her that

> You are excluded from participation in the Medicare, Medicaid, and **all** Federal
> health care programs as defined in section 1128B(f) of the Social Security Act.
> The effect of your exclusion is that no program payment will be made for any
> items or services, including administrative and management services, (other than
> an emergency item or service not provided in a hospital emergency room)
> furnished, ordered, or prescribed by you, except as provided in regulations found
> at 42 CFR 1001.1901(c), during the period you are excluded.  Your exclusion
> affects only your ability to claim payment from those programs for items or
> services you render; it does not affect your right to collect benefits under these
> programs.
>
> This exclusion has national effect and applies to all Federal procurement and non-
> procurement programs and activities.
>
> If you are an individual, program payment will not be made to any entity in which
> you are serving as an employee, administrator, operator, or in any other capacity,
> for any services including administrative and management services that you
> furnish, order, or prescribe on or after the effective date of this exclusion. . . .
>
> Any service you provide is a non-covered service.  Therefore, you cannot submit
> claims or cause claims to be submitted for payment under any Federal health care
> program.  Violations of the conditions of your exclusion may subject you to
> criminal prosecution and the imposition of civil monetary penalties (42 U.S.C.
> 1320a-7a – 42 U.S.C. 1320a-7b). In addition, submitting claims or causing claims
> to be submitted or payments to be made by the programs for items or services you
> furnish, order, or prescribe, including management services or salary can serve as
> the basis for denying your reinstatement to the programs. . . .
>
> Obtaining a license or obtaining a provider number from a Medicare contractor, a
> State agency, or a Federal health care program does not reinstate your eligibility
> to participate in those programs.

41.     According to an HHS-OIG Special Advisory Bulletin on the Effect of Exclusion

from Participation, issued May 8, 2013, "[t]he prohibition on Federal health care program

payment for items or services furnished by an excluded individual includes items and services

beyond direct patient care." "[A]n excluded individual may not serve in an executive or

leadership role (e.g., chief executive officer, chief financial officer, general counsel, director of

health information management, director of human resources, physical practice office manager,

etc.) at a provider that furnishes items or services payable by Federal health care programs.

Also, an excluded individual may not provide other types of administrative and management

services, such as health information technology services and support, strategic planning, billing

and accounting, staff training, and human resources, unless wholly unrelated to Federal health

care programs." "[A]n excluded person may own a provider, but may not provide any items or

services, including administrative and management services, that are payable by Federal health

care programs."

### C. The Medicaid Program and Home Care Agencies

42.     Medicaid is a health insurance program established by Congress under Title XIX

of the Social Security Act of 1965, which provides health insurance coverage to individuals

whose incomes are below a certain financial threshold as measured against the poverty line.

Recipients of medical services covered by Medicaid are referred to as Medicaid "beneficiaries."

Medicaid is overseen and administered by the Centers for Medicare and Medicaid Services

("CMS"), an agency within the United States Department of Health and Human Services

("HHS"). In the District of Columbia, the federal government provides the funding for more

than 70% of Medicaid, with the District of Columbia providing the remaining funds. Until

September 30, 2008, Medicaid in the District of Columbia ("D.C. Medicaid") was administered

by the Department of Health's Medical Assistance Administration; however, since October 1,

2008, it has been administered by the District's Department of Health Care Finance ("DHCF").

In Maryland, Medicaid is also jointly funded by the federal and state governments, and is administered by the Maryland Department of Health and Mental Hygiene.

43.     Medicaid is a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

44.     In the District of Columbia, home care agencies ("HCAs") are authorized to provide personal care services to D.C. Medicaid beneficiaries.  In Maryland, these entities are known as home health agencies or residential service agencies, but are referred to herein as HCAs.  Such services are provided by personal care aides ("PCAs") and are intended to assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs."  ADLs include the ability to get in and out of bed, bathe, dress, eat out, and engage in toileting.

45.     In order to receive payments from Medicaid for providing covered PCA services, HCAs must submit an enrollment application to obtain a Medicaid provider number.  Companies such as HCAs that are enrolled in Medicaid and purport to provide health care items or services to Medicaid beneficiaries are known as "providers."  In the provider application, the HCA agrees to abide by all federal and local laws, regulations, and program manuals applicable to HCAs.

46.     Along with the Medicaid provider enrollment application, the HCA also signs a provider agreement.  Among other things, the D.C. Medicaid provider agreement requires that the provider include:  "A description of ownership and a list of major owners (stockholders owning or controlling five percent or more outstanding shares)."  The provider agreement further specifies that D.C. Medicaid can reject or terminate the agreement if the "owners, officers, managers or other persons with substantial contractual relationships have been convicted of certain crimes or received certain sanctions as specified in Section 1128 of the Social Security Act."  Further, in signing the provider agreement, the HCA and its authorized representative

certify that they understand that payment of a claim by D.C. Medicaid is conditioned upon the claims and the underlying transactions complying with all relevant laws, regulations, and applicable program instructions, and on the HCA's compliance with all applicable conditions of participation in D.C. Medicaid.

47.     Providers accepted into the D.C. Medicaid program are given a unique provider identification number; only providers who have been assigned a provider number can submit claims for payment to Medicaid.

48.     Once it obtains a provider number, an HCA can submit or cause the submission of claims to D.C. Medicaid for payment of PCA services that the HCA claims to have provided.  To receive payments from D.C. Medicaid, HCAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form.  DHCF contracts with Xerox, formerly known as Affiliated Computer Services, Inc., to serve as its fiscal agent and receive and process claims submitted by D.C. Medicaid providers, including claims for PCA services.

49.     Once Xerox processes a claim, it sends the approved claim amount back to DHCF; DHCF then forwards the information to the D.C. Treasury, which pays the approved D.C. Medicaid claim either via check sent through the U.S. mail or via electronic fund transfer, whichever method the provider has requested.

50.     On each claim form that an HCA submits or causes to be submitted to D.C. Medicaid, the HCA has to identify certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was purportedly provided, and the amount of money being claimed by the HCA as payment from D.C. Medicaid.  D.C. Medicaid only pays for services that were medically reasonable and necessary, and that were actually provided as claimed.  Maryland Medicaid

works essentially the same, however the claims are submitted directly to Maryland Medicaid.

Once the claims are approved, payments are sent by the state treasury to the provider, either via

U.S. mail or via electronic deposit, whichever method the provider has requested.

## D. FLORENCE BIKUNDI'S USE OF HOME CARE AGENCIES TO OBTAIN MEDICAID FUNDS IN VIOLATION OF HER EXCLUSION

### 1. Introduction

51.     Florence Bikundi owns, controls, administers, and manages Global Healthcare

and Flo-Diamond.

52.     Between November 16, 2009, and December 31, 2013, Global Healthcare

received over $75 million from the District of Columbia Medicaid Program.  Between January

21, 2011, and December 31, 2013, Global Healthcare received over $600,000.00 from the

Maryland Medicaid Program.  Law enforcement agents have reviewed documents in which

Florence Bikundi has been identified as a Director, President, Owner, CEO, CFO, Director of

Human Resources, and Administrator for Global Healthcare.  Law enforcement agents have also

seen a Global Healthcare business card in the name of Florence Bikundi with the title of

Administrator, which was provided by Florence Bikundi to a financial institution at which she

banked.

53.     Between July 7, 2007, and December 31, 2013, Flo-Diamond received over $2.7

million from the State of Maryland Medicaid Program.  Law enforcement agents have reviewed

documents in which Florence Ngwe is named as the resident agent, Director, and Incorporator

for Flo-Diamond; Florence Igwacho is listed as the resident agent; and Florence Bikundi is

identified as the Owner, Director, CEO, Vice President, and resident agent.

17

2. **Global Healthcare**

54.     Commonwealth of Virginia State Corporation Commission ("SCC") records indicate that Global Healthcare was formed on May 2, 2007. Its current status is "terminated." The principal office address is listed as 85 South Brag Street, Suite 500, Alexandria, Virginia.

55.     Maryland State Department of Assessment and Taxation ("SDAT") records indicate that Global Healthcare has had two registrations. The first registration was a Foreign Corporation Qualification filed on October 9, 2008, under SDAT identification number F12750428. The Foreign Corporation Qualifications provides an address of 14531 Oakcluster Drive, Centerville, Virginia, and lists the Maryland principal office location as 600 Reisterstown Road, Suite 300A, Pikesville, Maryland. Florence Bikundi is named as the resident agent with the same address as the Maryland office.

56.     On April 28, 2009, Florence Bikundi filed an "Application for Termination for a Foreign Corporation Qualification" for SDAT identification number F12750428. The termination form lists the principal office in Maryland as 15703 Appleton Court, Bowie, Maryland, and the resident agent as Florence Bikundi with the same address.

57.     The second Maryland registration for Global Healthcare was on April 28, 2009, under SDAT identification number D13027735. According to the Articles of Incorporation, Florence Bikundi formed Global Healthcare "to engage in the business of personal health care" and "[t]o carry on and transaction, for itself or for account of others, the business of . . . importers and exporters of natural products, raw materials, manufactured products and marketable goods." Florence Bikundi is named as the resident agent and sole director. The Articles of Incorporation list the address of Global Healthcare and Florence Bikundi as 15703 Appleton Court, Bowie, Maryland. Florence Bikundi signed the Articles of Incorporation both as the person forming Global Healthcare and as the resident agent. On February 23, 2011,

Florence Bikundi, as the resident agent, filed a resolution changing the principal office address and resident agent address to 806 Jennings Mill Drive, Bowie, Maryland.  The current mailing address listed for Global Healthcare is 1818 New York Avenue, NE, Suite 204, Washington, DC. Law enforcement agents have recently observed that Global Healthcare now occupies Suites 115 and 117 at 1818 New York Avenue, NE.

58.     On January 24, 2008, the District of Columbia Department of Consumer and Regulatory Affairs issued a Certificate of Authority to Global Healthcare to transact business as a foreign corporation in the District of Columbia.  On April 4, 2008, Florence Bikundi, as President of Global Healthcare, filed a "Two-Year Report for Foreign and Domestic Business Corporations" with the District of Columbia Department of Consumer and Regulatory Affairs.

### 3. Global Healthcare Submissions to District of Columbia Department of Health

### Department on Disability Services Waiver Provider Enrollment Application Package

59.     Florence Bikundi, on behalf of Global Healthcare, submitted a Department on Disability Services Waiver Provider Enrollment Application ("DDS Waiver Application") to the District of Columbia Department of Health ("D.C. Department of Health").  The application was to provide services to mentally challenged adults.  It is dated March 17, 2008, and is signed by Florence Bikundi as "C.E.O."  "No" is checked in response to the following questions:  "10p) Has the applicant/provider ever been rejected or suspended from the Medicare or Medicaid program, or has your participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled or sanctioned)?; 10q) With the last five (5) years, has the applicant provider ever been sanctioned, reprimanded or otherwise disciplined in any manner by any state licensing authority or other professional board or peer committee?"

60.     The DDS Waiver Application required Global Healthcare to attach a description of ownership.  Global Healthcare submitted a piece of paper with "Description of Ownership" typed at the top.  The following is typed beneath the title: "1) Ms. Bikindi Igwacho Florence = 60%; 2) Earnest Igwacho = 20%; 3) Mr. Michael Davis Bikindi = 20%."

61.     The DDS Waiver Application also required Global Healthcare to attach "basic organizational documents."  The attached documents included: (1) a corporate resolution, dated May 2, 2007, naming Florence Bikundi as Director; (2) "Minutes of the First Meeting of Board of Directors," electing Florence Bikundi as President;[3] and (3) "Minutes of Annual Meeting of Shareholders of Global Healthcare," listing Florence Bikundi as owning 70% of Global Healthcare's shares, and Michael Bikundi, Ernest Igwacho, and Carlson Igwacho each owning 10%.

62.     The DDS Waiver Application included a consent form authorizing the District of Columbia Medical Assistance Administration to obtain all information relevant to the evaluation of the application.  Florence Bikundi signed the consent form as "Authorized Applicant/Provider."  As part of the consent form, Florence Bikundi "warrant[ed]" that all of her responses and information were "correct and complete to the best of [her] knowledge and belief."  Florence Bikundi also signed two separate forms for Request for Taxpayer Identification Number and Certification.

63.     Florence Bikundi signed the DDS Waiver Provider Agreement with the D.C. Department of Health.  She signed once as "Provider" and once as an individual "responsible to enforce compliance with the[] conditions" in the agreement.

---

[3] The Minutes indicate that "Florence Bikundi RN" was present at the meeting.

## Medicaid Provider Application

64.     On June 3, 2009, Global Healthcare Services submitted a Medical Provider Application for a Home Health agency to the D.C. Department of Health. "James Mbide/Florence Igwacho Bikundi" are listed as the contact names on the application. Global Healthcare submitted a Medicaid Provider Agreement with the application. The "Provider" signature on the agreement is in the name of James Mbide. Under the heading of "Signature of individuals responsible to enforce compliance with these conditions," Florence Bikundi signed as "Chief Executive Officer," and Dr. Ernest Igwacho signed as "Chief Medical Officer."

65.     Section 17 of the application includes the following questions: "(1) Have any of your professional licenses, in any state, ever been limited, sanctioned, voluntarily/involuntarily restricted, denied, revoked, suspended, surrendered, subjected to a consent order, placed on probation or cancelled?; (2) Have you ever been named a Defendant in any criminal case, other than misdemeanor traffic violation?; and (3) Have you ever been suspended from the Medicare or Medicaid program, or has your participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled)?" "No" is checked in response to all of these questions. However, the individual listed as the "applicant" for the application is James Mbide, not Florence Bikundi.

66.     As part of the application, Global Healthcare was required to identify all individuals "having direct or indirect ownership or controlling interest" in the company. No individuals are listed in this section.

## Home Care Agency License Application

67.     Florence Bikundi, on behalf of Global Healthcare, submitted a renewal application for a Home Care Agency License to the D.C. Department of Health. The application

is dated January 19, 2010, and is signed by Florence Bikundi as the applicant and "CFO." The contact person listed for the application is "Ms. Bikundi Florence RN" with email addresses of florencebikundi@globalhealthcs.com and florencebikundi@yahoo.com. The $700.00 license fee was paid with a Global Healthcare check signed by Florence Bikundi. Florence Bikundi signed the "Home Care Agencies Insurance Verification Request Form" as the "HCA Official."

### Correspondence with the D.C. Department of Health

68.     Florence Bikundi sent a letter to the D.C. Department of Health, dated July 1, 2009, asserting that Global Healthcare Services did not need a Certificate of Need to provide non-skilled nursing services for a home health agency. The title typed below her signature is "Administrator."

69.     Florence Bikundi sent a letter, dated January 12, 2010, to the Senior Deputy Director for the Health Regulation and Licensing Administration, in response to a letter about Global Healthcare's license renewal application.

70.     On March 13, 2012, Florence Bikundi sent an email to the Department of Health discussing monthly visits to a patient. She listed her title as "Administrator" at the end of the email. As discussed in further detail below, Florence Bikundi has also signed forms directing the District of Columbia to send Medicaid funds to Global Healthcare accounts at certain banks. In one form, Florence Bikundi signed as "CFO or Authorized Representative." In another form, she signed as the "Authorizing Official," and "Administrator" was written after her signature.

**4. Global Healthcare Submissions to Maryland Department of Health and Mental Hygiene**

**2010 Medicaid Provider Application**

71.    On April 5, 2010, Global Healthcare Services submitted a Medicaid Provider Application for the "Living at Home Waiver Program" to the Maryland Department of Health and Mental Hygiene ("Maryland Department of Health"). The application lists Michael Bikundi as the "Provider," but Florence Bikundi signed in the space for "Provider's Signature." The address provided for Global Healthcare is 600 Reisterstown Road, Suite 300A, Pikesville, Maryland. On the Provider Application Form, the name Florence Bikundi is crossed out as the provider. There is no name replacing the crossed out name of Florence Bikundi. However, the Authorization section of the Provider Application Form names Florence Bikundi as the provider and is signed by her.

72.    The Provider Ownership and Control Form identifies Michael Bikundi and Florence Bikundi as the only officers or directors of Global Healthcare. Michael Bikundi is listed as having a direct or indirect ownership interest of 5% or more, and Michael Bikundi and Florence Bikundi are listed as having a combination of direct or indirect ownership interest equal to 5% or more. Florence Bikundi signed the ownership form as "Director of Human Resources."

73.    Florence Bikundi signed the Medicaid Provider Agreement between Global Healthcare and the Maryland Department of Health as "Provider." The agreement requires Global Healthcare to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

### 2011 Medicaid Provider Application

74.     On April 20, 2011, Global Healthcare submitted a Medicaid Provider Application to the Maryland Department of Health.  The application lists the owners of Global Healthcare as Michael Bikundi and Florence Bikundi.  The address provided for Global Healthcare is 806 Jennings Mill Drive, Bowie, Maryland.  The Employer Identification Number ("EIN") listed on the application, 20-3396243, is the EIN for Flo-Diamond.  Michael Bikundi signed the application as the "Practitioner, Administrator or Authorized Professional Responsible for the Quality of Patient Care."  The Provider Ownership and Control Disclosure Form names Michael Bikundi and Florence Bikundi as officers or directors with each of them having a direct or indirect ownership interest of 5% or more.  Michael Bikundi signed the ownership form as "C.E.O."

75.     Michael Bikundi signed the Medicaid Provider Agreement between Global Healthcare and the Maryland Department of Health as "Provider."  The agreement requires Global Healthcare to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

### 5. Flo-Diamond

76.     SDAT records indicate that Flo-Diamond was formed on December 8, 2004. Florence Ngwe signed the Articles of Incorporation and is named as the resident agent, lone Director, and incorporator.  The articles provide an address of 7610 Wethersfield Place, Beltsville, Maryland for Flo-Diamond and Florence Ngwe.  According to the articles, Flo-Diamond will carry on lawful businesses and "also operate an Import/Export Business."

77.     On March 18, 2010, Florence Bikundi filed a "Resolution to Change Principal

Office or Resident Agent" for Flo-Diamond. The resolution provides that the new address for

Flo-Diamond and Florence Bikundi is 600 Reisterstown Road, Suite 300A, Pikesville, Maryland.

Florence Bikundi signed the resolution as the resident agent and the authorized person.

78.     On September 19, 2012, another "Resolution to Change Principal Office or

Resident Agent" for Flo-Diamond was filed. The resolution states that the new address for Flo-

Diamond is 3042 Mitchellville Road, Bowie, Maryland. The resolution is signed but law

enforcement agents were unable to read the name. The name Florence Igwacho is printed in the

field above the signature line for resident agent.

79.     District of Columbia Department of Consumer and Regulatory Affairs records

indicate that Flo-Diamond registered with the department on December 16, 2005. Its current

status is listed as "revoked."

### 6. Flo-Diamond Submissions to Maryland Department of Health Provider Application for Medicaid Waiver for Older Adults

80.     On March 1, 2006, Flo-Diamond Healthcare Services submitted a Provider

Application for Medicaid Waiver for Older Adults. Michael Bikundi signed the application as

"Provider." A Medical Care Program application was also submitted. The program application

identifies Michael Bikundi as the owner of Flo-Diamond. Michael Bikundi signed the program

application as the person responsible for the "quality of patient care." The Provider Ownership

and Control Disclosure Form names Michael Bikundi as the sole officer or director and Carlson

Igwacho as the sole person with a direct or indirect ownership interest of 5% or more. Michael

Bikundi signed the ownership form as "Administrator."

81.     Michael Bikundi signed the Medicaid Provider Agreement between Flo-Diamond

and the Maryland Department of Health as "Provider." The agreement requires Flo-Diamond to

"not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

82.     Law enforcement agents have reviewed other submissions and applications from Flo-Diamond to the Maryland Department of Health.  Florence Bikundi signed some of these forms with different titles, including "Practitioner, Administrator or Authorized Professional Responsible for the Quality of Patient Care," "C.E.O.," "Provider," and "Vice President." Florence Bikundi is also listed as an officer or director, contact person, and as having a direct or indirect ownership interest of 5% or more on some of the forms.  On June 20, 2007, Florence Bikundi, on behalf of Flo-Diamond, signed a Trading Partner Agreement with the Maryland Medicaid program permitting Flo-Diamond to use a billing service to process transactions for Medicaid recipients.

### E.  LAUNDERING OF MEDICAID FUNDS

#### 1. Introduction

83.     Florence Bikundi caused Medicaid to make payments to Global Healthcare and Flo-Diamond in violation of her exclusion.  The fraudulently obtained payments were deposited into Medicaid "intake" accounts[4] in the names of Global Healthcare and Flo-Diamond.  The Medicaid funds were then transferred to numerous other accounts controlled by Florence Bikundi and/or Michael Bikundi, including other intake accounts.  To date, over 50 accounts have been identified as being involved in the process of laundering Medicaid funds.

84.     Layering involves a financial transaction or series of financial transactions that separate unlawfully obtained proceeds from their source and, in the process, conceal the illegal nature of the proceeds and complicate an audit trail.  Multiple transfers of proceeds, the use of

---

[4] As referenced herein, intake accounts are accounts that received funds directly from DC Medicaid or Maryland Medicaid.

shell corporations, the purchase of cashier's checks, a high volume of cash transactions, and the movement of proceeds to foreign jurisdictions are all indicative of layering. The evidence in this case indicates that Florence Bikundi knowingly conducted financial transactions involving the proceeds of illegal activity, specifically the receipt of Medicaid funds in violation of multiple Federal health care statutes.

85.    The evidence in this case indicates that Florence Bikundi used accounts in the names of two shell corporations, Tri-Continental Trade and Development, Inc. ("Tri-Continental Trade and Development") and CFC Home Trade and Investment, LLC ("CFC Home Trade and Development") to launder her illegal proceeds and avoid law enforcement and regulatory scrutiny by making it appear that the some of the proceeds were derived from these corporations rather than Medicaid.

86.    From November 16, 2009, to December 31, 2013, over 90% of the funds obtained by Global Healthcare and Flo-Diamond were from Medicaid payments. During this same time period, Florence Bikundi has directly or indirectly obtained at least $13 million traceable to or derived from Medicaid payments.

87.    From October 2009 to December 2013 (Fourth Quarter of 2013), Global Healthcare reported to the District of Columbia that it paid a total of $997,668.00 in wages, of which $296,000.00 was paid to Florence Igwacho under social security number XXX-XX-8123, $220,000.00 was paid to Michael Bikundi under social security number XXX-XX-7406, $16,400.00 was paid to Michael Bikundi, Jr. under social security number XXX-XX-5843, and $16,800.00 was paid to Carlson Igwacho under social security number XXX-XX-0762. The most recently available records from the District of Columbia for the Fourth Quarter of 2013 only report the total wages paid by Global Healthcare. The wages are not itemized by employee.

From October 2009 to December 2013, Flo-Diamond reported to Maryland that it paid a total of $501,745.00 in wages, of which $332,000.00 was paid to Florence Bikundi under social security number XXX-XX-8123 and $71,264.00 was paid to Michael Bikundi, Jr. Flo-Diamond did not report any wages to the State of Maryland for Michael Bikundi or Carlson Igwacho. Neither Tri-Continental Trade and Development nor CFC Home Trade and Investment have ever reported wage payments to the District of Columbia, Maryland, and Virginia.

88.    Between November 16, 2009, and December 31, 2013, approximately $7.2 million in cashier's checks were deposited into accounts under the control of Florence Bikundi. A majority of these cashier's checks were made payable to Florence Igwacho or Florence Bikundi. These cashier's checks were purchased from accounts containing funds traceable to or derived from Medicaid payments. A cashier's check is a check drawn from a bank's own funds and provides no information about the source of the funds used to purchase it.

89.    Between November 16, 2009, and December 31, 2013, approximately $3.6 million in checks, drawn from accounts in the names of Global Healthcare, Flo-Diamond, Tri-Continental Trade and Development, and CFC Home Trade and Investment, were made payable to Florence Bikundi or Florence Igwacho. Approximately $427,022.18 of this amount was in the form of checks payable to Florence Igwacho, but with the signature of Florence Bikundi on the front of the check. The evidence in this case suggests that Florence Bikundi made the checks payable to Florence Igwacho to make it appear that the payee was not the same person as Florence Bikundi.

90.    Between November 16, 2009, and November 30, 2013, approximately $900,000.00 in cash has been withdrawn from accounts controlled by Florence Bikundi and/or Michael Bikundi.

91.     Between October 27, 2011, and November 12, 2013, at least $537,500.00 in funds traceable to Medicaid payments has been wired to Cameroon.

92.     Florence Bikundi has used funds traceable to or derived from Medicaid payments to pay for and lease luxury vehicles, to pay for airline tickets, home furnishings, home remodeling, hotel stays, to pay off a mortgage, to establish 529 College Savings Plans for her children and grandchildren, and to place in investment accounts. The evidence indicates that Florence Bikundi has conducted numerous monetary transactions over $10,000 in violation of 18 U.S.C. § 1957.

93.     Florence Bikundi has written checks from accounts containing funds traceable to or derived from Medicaid payments to pay business expenses for Global Healthcare and Flo-Diamond. The expenses include rent, utilities, wages, taxes, office supplies, attorney fees, and accounting fees. The evidence indicates that these financial transactions have promoted the continued success of her scheme in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

### 2. Tri-Continental Trade and Development

94.     SDAT records indicate that Tri-Continental Trade and Development was formed on May 1, 2008. According to its Articles of Incorporation, it is an import/export business. Florence Bikundi and Michael Bikundi are named as it directors. Florence Bikundi is also listed as the resident agent. The address provided for both Tri-Continental Trade and Development and Florence Bikundi is 600 Reisterstown Road, Suite 300A, Pikesville, Maryland.

95.     SDAT records reflect that on October 1, 2010, Tri-Continental Trade and Development's corporate status was forfeited for its failure to file a 2009 Property Return.

96.     On March 11, 2011, Tri-Continental Trade and Development filed an "Articles of Revival." Florence Bikundi signed the articles as the resident agent, and Michael Bikundi signed

as director.  The articles provide an address of 806 Jennings Mill Drive, Bowie, Maryland for both Tri-Continental Trade and Development and Florence Bikundi.  As a result of this filing, Tri-Continental Trade and Development again has corporate status with SDAT.

97.    A review of financial records associated with Florence Bikundi reflects that approximately $7.8 million in funds traceable to Medicaid reimbursements have been deposited into accounts in the name of Tri-Continental Trade and Development.  The Medicaid funds appear to be the only source of funds deposited into these accounts.

### 3. CFC Home Trade and Investment

98.    SDAT records indicate that CFC Home Trade and Development was formed on October 12, 2012.  According to its Articles of Organization, CFC Home Trade and Development is engaged in real estate development.  Carlson Igwacho is listed as the resident agent.  The address provided for both CFC Home Trade and Investment and Carlson Igwacho is 3042 Mitchellville Road, Bowie, Maryland.

99.    SDAT records reflect that CFC Home Trade and Development's current status is active, but it is not in good standing.  According to SDAT, a corporation that is not in good standing has either not filed the current year's Annual Report/Personal Property Return or owes a late filing penalty.

100.    A review of financial records associated with Florence Bikundi reflects that approximately $4.5 million in funds derived from Medicaid payments have been deposited into accounts in the name of CFC Home Trade and Development.  The Medicaid funds appear to be the only source of funds deposited into the accounts.

## F.  FINANCIAL INSTITUTION ACCOUNTS

101.     Law enforcement agents have reviewed over 60 financial institution accounts

controlled by Florence Bikundi and/or Michael Bikundi.  On some account opening documents,

Florence Bikundi has indicated that she is a U.S. citizen.

102.     Global Healthcare first received District of Columbia Medicaid funds on

November 16, 2009.  Between November 16, 2009, and December 31, 2013, Global Healthcare

received approximately $75 million in Medicaid payments from the District of Columbia.  The

amount of District of Columbia Medicaid payments to Global Healthcare per year is as follows:

| DATE RANGE | DISTRICT OF COLUMBIA MEDICAID FUNDS |
|---|---|
| November 16, 2009 – December 31, 2009 | $984,589.48 |
| January 1, 2010 – December 31, 2010 | $9,929,989.40 |
| January 1, 2011 – December 31, 2011 | $13,594,180.83 |
| January 1, 2012 – December 31, 2012 | $23,814,678.14 |
| January 1, 2013 – December 31, 2013 | $27,102,752.28 |
| | TOTAL: $75,426,190.13 |

103.     Global Healthcare first received Maryland Medicaid funds on January 21, 2011.

Between January 21, 2011, and December 31, 2013, Global Healthcare received approximately

$608,069.07 in Medicaid payments from Maryland.  The amount of Maryland Medicaid

payments to Global Healthcare per year is as follows:

| DATE RANGE | MARYLAND MEDICAID FUNDS |
|---|---|
| January 21, 2011 – December 31, 2011 | $80,447.02 |
| January 1, 2012 – December 31, 2012 | $197,825.71 |
| January 1, 2013 – December 31, 2013 | $329,796.34 |
| | TOTAL: $608,069.07 |

104.     Flo-Diamond first received Maryland Medicaid funds on July 7, 2007.  Between

July 7, 2007, and October 31, 2009, Maryland Medicaid paid approximately $789,321.81 to Flo-

Diamond.  Between November 1, 2009, and December 31, 2013, Flo-Diamond received

approximately $1,947,657.22 in Medicaid payments from Maryland.  The Maryland Medicaid payments to Flo-Diamond during that time period are as follows:

| DATE RANGE | MARYLAND MEDICAID FUNDS |
|---|---|
| November 1, 2009 – December 31, 2009 | $40,468.77 |
| January 1, 2010 – December 31, 2010 | $479,024.15 |
| January 1, 2011 – December 31, 2011 | $438,883.49 |
| January 1, 2012 – December 31, 2012 | $427,267.43 |
| January 1, 2013 – December 31, 2013 | $562,013.38 |
| | TOTAL: $1,947,657.22 |

### G. THE DEFENDANT PROPERTY

#### 1. The Wire Transfers

105.     Michael Bikundi has been the originator of at least 21 wire transfers, totaling $537,500.00, to two BICEC accounts.  Michael Bikundi is listed as the beneficiary on 16 wires to BICEC account #4725116400116, totaling $450,000.00, and McRoy Bikundi is listed as the beneficiary on five wires to BICEC account #3527750000121, totaling $87,500.  The funds wired to the BICEC accounts originated from Citibank account #9104117466, Citibank account #9104117474, and Citibank account #9104812207.  The details of each wire transfer are as follows:

| Date | Amount | Originating Account | Beneficiary Account | Beneficiary |
|---|---|---|---|---|
| 10/27/2011 | $25,000.00 | Citibank account #9104117466 | BICEC account #4725116400116 | Michael Bikundi |
| 10/31/2011 | $30,000.00 | Citibank account #9104117466 | BICEC account #4725116400116 | Michael Bikundi |
| 11/7/2011 | $30,000.00 | Citibank account #9104117466 | BICEC account #4725116400116 | Michael Bikundi |
| 11/18/2011 | $30,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |
| 12/16/2011 | $25,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |
| 1/11/2012 | $50,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |

| Date | Amount | Originating Account | Beneficiary Account | Beneficiary |
|---|---|---|---|---|
| 2/9/2012 | $25,000.00 | Citibank account #9104117466 | BICEC account #4725116400116 | Michael Bikundi |
| 5/24/2012 | $30,000.00 | Citibank account #9104117474 | BICEC account #472511400116 | Michael Bikundi |
| 6/1/2012 | $30,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |
| 7/6/2012 | $30,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |
| 9/10/2012 | $20,000.00 | Citibank account #9104812207 | BICEC account #3603410000121 | Michael Bikundi |
| 10/16/2012 | $30,000.00 | Citibank account #9104117466 | BICEC account #4725116400116 | Michael Bikundi |
| 10/16/2012 | $10,000.00 | Citibank account #9104812207 | BICEC account #3603410000121 | Michael Bikundi |
| 11/15/2012 | $30,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |
| 11/21/2012 | $25,000.00 | Citibank account #9104117466 | BICEC account #4725116400116 | Michael Bikundi |
| 1/31/2013 | $30,000.00 | Citibank account #9104117474 | BICEC account #4725116400116 | Michael Bikundi |
| 9/16/2013 | $9,500.00 | Citibank account #9104117466 | BICEC account #3527750000121 | McRoy A. Bikundi |
| 10/7/2013 | $10,000.00 | Citibank account #9104117466 | BICEC account #3527750000121 | McRoy A. Bikundi |
| 10/21/2013 | $20,000.00 | Citibank account #9104117466 | BICEC account #3527750000121 | McRoy A. Bikundi |
| 10/30/2013 | $28,000.00 | Citibank account #9104117466 | BICEC account #3527750000121 | McRoy A. Bikundi |
| 11/12/2013 | $20,000.00 | Citibank account #9104117466 | BICEC account #3527750000121 | McRoy A. Bikundi |

## 2. The Originating Accounts

### Citibank Account #9104117466

106.    On or about October 25, 2010, Florence and Michael Bikundi opened Citibank account #9104117466 held in the names of Florence Bikundi and Michael Bikundi.  Florence Bikundi and Michael Bikundi are the only signatories on the account.

107.    Between October 25, 2010, and November 30, 2013, at least $3,980,590.06 was deposited into this account.  Of this amount, $3,892,000.00 is traceable to Medicaid with $1,229,700.00 deposited from Citibank account #9104117474, $860,000.00 deposited from Citibank account #9105743303, $750,000.00 deposited from Citibank account #910703559, $538,000.00 deposited from PNC Bank account #5303186271, $305,000.00 deposited from Bank of America account #446029676749, $150,000.00 deposited from PNC Bank account #5558785874, $35,000.00 deposited from PNC Bank account #5305884743, $20,000.00 deposited from Citibank account #9108014624, and $4,500.00 deposited from Bank of America account #446012770461.   Other deposits to the account include $64,525.80 from third parties, $22,812.93 in returned items and returned checks, $1,000.00 in cash, and $51.33 in interest.

### Citibank Account #9104117474

108.    On or about October 25, 2010, Florence and Michael Bikundi opened Citibank account #9104117474 held in the names of Florence Bikundi and Michael Bikundi.  Florence Bikundi and Michael Bikundi are the only signatories on the account.

109.    Between October 25, 2010, and November 30, 2013, at least $3,399,166.91 was deposited into Citibank account #9104117474.  Of this amount, $3,173,011.95 is traceable to Medicaid with $1,705,000.00 deposited from Citibank account #9104117466, $896,000.00 deposited from PNC Bank account #5303186271, $473,500.00 deposited from Citibank account

#9105743303, $125,000.00 deposited from PNC Bank account #5558785874, $94,881.74 deposited from PNC Bank account #5305884743, $15,000.00 deposited from Bank of America account #446029676749, and $3,630.21 deposited from Bank of America account #446028722254. Other deposits to the account include $7,121.93 from third parties, $6,000.00 in cash, and $1,426.03 in interest.

### Citibank Account #9104812207

110.    On March 7, 2012, Michael Bikundi opened Citibank account #9104812207 in the name of Michael D. Bikundi. Michael Bikundi is the only signatory on this account.

111.    From March 7, 2012, to November 30, 2013, there was at least $464,771.16 deposited into Citibank account #9104812207. Of this amount $430,360.00 is traceable to Medicaid payments. The deposits traceable to Medicaid payments are a total of $170,936.78 from PNC Bank account #5317322414, $80,000.00 from Bank of America account #446029676749, $80,000.00 from Citibank account #9105743303, $50,343.82 from Citibank account #9107299998, $15,090.00 from PNC Bank account #5303186271, $12,726.50 deposited from PNC Bank account #5305884743, $11,262.90 from Bank of America #446028722254, and $10,000.00 from Citibank account #9104812215. Other deposits to the account include $17,500.00 in cash, $15,615.00 from the sale of a vehicle, and $126.16 in interest.

## IX. STATUTORY BASIS FOR FORFEITURE

112. Title 18, United States Code, section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is subject to forfeiture.

113. Section 1956(c)(7)(F) defines specified unlawful activity as "any act or activity constituting an offense involving a Federal health care offense. Pursuant to 18 U.S.C. § 24, a "Federal health care offense" includes Health Care Fraud, in violation of 18 U.S.C. §1347, and Making or Causing to be Made False Statements or Representations, in violation of 42 U.S.C. § 1320a-7b(a)(3).

114. Title 18, United States Code, section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property" is subject to forfeiture.

115. Under 18 U.S.C. § 981(k)(1)(A), if funds are deposited into an account at a foreign financial institution , and that foreign financial institution has an interbank account in the United States with a covered financial institution, the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign financial institution, may be restrained, seized, or arrested.

116. Title 18, United State Code, section 981(k)(2) provides that when a forfeiture action is brought, pursuant to section 981(k)(1)(A), it is not necessary for the United States to establish that the funds are directly traceable to the funds that were deposited into the foreign

financial institution, nor is it necessary for the Government to rely on the application of section 984.

## X. CONCLUSION

**WHEREFORE**, the United States prays that this Court decree that all right, title, and interest in the defendant property be condemned and forfeited to the United States of America, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Ronald C. Machen Jr.*
RONALD C. MACHEN JR., D.C. Bar No. 447889
United States Attorney for the District of Columbia

/s/ *Catherine K. Connelly*
Catherine K. Connelly, Mass Bar No. 649430
Assistant United States Attorney
Deputy Chief, Asset Forfeiture and
Money Laundering Section

/s/ *Anthony Saler*
Anthony Saler, D.C. Bar No. 448254
Assistant United States Attorney
555 Fourth Street, N.W., Room 4816
Washington, D.C. 20530
(202) 252-6971
anthony.saler@usdoj.gov

Counsel for Plaintiff United States

## VERIFICATION

I, Nicole S. Hinson, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Secret Service, that I have read the foregoing Verified Complaint and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 25, 2014

_Nicole S Hinson_

Special Agent Nicole S. Hinson
United States Secret Service

38